FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2016 MAR 30  AM 9: 28

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

JAMES BELTON,

                    Plaintiff,

v.                                    Case No. 3:12-cv-885-J-20MCR

NURSE R. FOWLER,

                    Defendant.

_____

## ORDER

### I. Status

Plaintiff James Belton (Belton), an inmate of the Florida penal system who is proceeding in forma pauperis, initiated this action on August 6, 2012, by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. Belton filed a First Amended Complaint for Money Damages (AC; Doc. 16) on August 11, 2014. In the Amended Complaint, Belton names the following individuals as Defendants in the action: (1) Dr. Long Duy Hoang, M.D.; (2) Dr. Miguel Gonzalez, M.D.; and (3) Nurse R. Fowler, Senior Licensed Practical Nurse.[1] He asserts that Defendants Gonzalez and Hoang violated his Eighth Amendment right to be free from cruel and unusual punishment when they delayed proper treatment for Tuberculosis (TB), and that Defendant Fowler "negligently permitted" him to be housed in general population in a particular

_____

[1] On April 22, 2015, the Court dismissed Defendants Dr. Long Duy Hoang, M.D. and Dr. Miguel Gonzalez, M.D. See Order (Doc. 36)

dormitory where other inmates were infected with the TB virus. <u>See</u> AC at 4. As relief, Belton requests compensatory and punitive damages.

This cause is before the Court on Defendant Fowler's Motion for Summary Judgment (Motion; Doc. 57), filed September 30, 2015.[2] The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. <u>See</u> Order of Special Appointment; Directing Service of Process Upon Defendants; Notice to Plaintiff (Doc. 17); Orders (Docs. 52, 65, 67). Plaintiff has responded. <u>See</u> Plaintiff's Motion in Opposition to Defendant's Summary Judgment (Response; Doc. 60); Sworn Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 69). Thus, Defendant's Motion is ripe for judicial review.

## II. Summary Judgment Standard

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

---

[2] The Court will refer to the exhibits appended to Defendant's Motion as Def. Ex.

those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Rule 56(c)(1)(A).[3] "An issue of fact is material if, under the applicable substantive law, it might affect the outcome of the case[,] and "[a]n issue of fact is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (citations and internal quotation marks omitted).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

F.3d 590, 593–94 (11th Cir. 1995) (per curiam) (citations and internal quotation marks omitted). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Hayes v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994) (per curiam)).

### III. Plaintiff's Allegations

According to Plaintiff, the following facts support his Eighth Amendment claim of deliberate indifference to his serious medical needs. He asserts that the Florida Department of Corrections (FDOC) housed him in C dormitory at Columbia Correctional Institution (CCI) for twelve to fifteen months. See AC at 5, ¶ 1.[4] On April 16, 2009, the FDOC moved him from C dormitory to an administrative confinement dormitory. See id. The confinement orderly told Plaintiff that C dormitory where he had been housed was infected

---

[4] The Court will refer to the page number in the upper right hand corner of the document that was assigned through the Court's electronic filing system.

4

with the TB virus, and that all inmates in C dormitory were being inoculated. See id. at ¶ 2. Plaintiff immediately wrote the medical clinic to request that testing and inoculation for the TB virus, but received no response. See id. at ¶ 3. When Plaintiff saw the confinement nurse, he explained that he wanted to be tested and inoculated since he had been housed in C dormitory. See id. Shortly thereafter, he was given a skin test with negative results. See id. at ¶ 4. On May 8, 2009, Dr. Nguyen ordered a chest X-ray (performed on May 11, 2009), which was also negative for the TB virus. See id. Despite these findings, Plaintiff complained of symptoms, but medical personnel advised him to visit sick call if his symptoms continued. See id. at ¶ 5.

Upon Plaintiff's release from administrative confinement on May 18, 2009, his symptoms continued, including loss of appetite and weight, vomiting, fatigue, fever, chest pains, pale skin, chills, night sweats, stomach cramps, shortness of breath, dizziness, black-outs, and coughing up blood. See id. at 5, ¶ 6. On May 26, 2009, Plaintiff sought medical assistance through sick call. See id. at ¶ 7. He reported that he was unable to eat the food served in the chow hall; he found that most foods were basically intolerable with the exception of Ramen noodle soups in the canteen since he was able to drink them. See id.

Dr. Gonzalez placed Plaintiff on a high-caloric diet and advised him to consume more food. See id. at ¶ 8. According to Plaintiff, his condition worsened and was readily apparent due to his dramatic weight loss. See id. at ¶ 9. On several occasions, he

5

visited the infirmary with a high fever, was given Tylenol, and then released back into general population. See id. at ¶ 10. On one occasion, when he passed out, he was placed under observation for twenty minutes, and then sent back to general population. See id.

On June 16, 2009,[5] Dr. Hoang transferred Plaintiff, who was in the CCI infirmary, to the Reception and Medical Center (RMC) for an upper abdominal sonogram. See id. at 6, ¶ 12. After the sonogram (which was negative), the FDOC returned Plaintiff to the CCI infirmary. See id. at ¶ 13. On June 17, 2009, the nurse was instructed to contact RMC and arrange to transfer Plaintiff if his condition did not improve. See id. When his condition did not improve, the FDOC transferred him to a specialist at RMC and admitted him to the RMC infirmary. See id. at ¶ 14.

On June 25, 2009, after a computerized axial tomography (CAT) scan of Plaintiff's chest at RMC, Plaintiff was diagnosed with Miliary Tuberculosis. See id. at ¶ 15. On July 8 and 13, 2009, at Memorial Hospital Jacksonville, Plaintiff underwent two surgical procedures in order to remove the TB virus from his system. See id. at 7, ¶ 17. Thereafter, Plaintiff completed a lengthy medication regimen, which caused some discomfort and tingling in his extremities. See id. at ¶ 18. According to Plaintiff, the Defendant(s) knew that all of the inmates, including Plaintiff, who had been housed in C dormitory had been exposed to the TB virus by being housed with the alleged infected inmate. Id. at ¶ 19.

---

[5] Belton refers to the year 2007; however, given the chronology of events, it appears that the year was 2009. See AC at 6, ¶ 12.

However, the Defendant(s) "chose to merely monitor or even ignore at times" Plaintiff's "worsening and deteriorating condition" before finally transferring him to a specialist at RMC. Id.

### IV. Defendant Fowler's Motion for Summary Judgment

Defendant Fowler asserts that there are no genuine issues of material fact in dispute, and therefore requests that summary judgment be entered in her favor. Defendant Fowler argues that summary judgment is appropriate because none of Plaintiff's assertions show that Fowler subjected him to cruel and unusual punishment in that: (1) Plaintiff fails to establish an Eighth Amendment violation against Defendant Fowler for failure to protect Plaintiff from contracting TB, see Motion at 9-14; (2) a 42 U.S.C. § 1983 claim for failure to protect cannot be based on hearsay, rumor, and innuendo, see id. at 15-17; (3) since Plaintiff contracted an atypical TB strain found generally in the everyday environment, Plaintiff cannot state a claim of deliberate indifference for failure to protect under § 1983 because of a lack of causation, see id. at 17-19; (4) even to the extent that Plaintiff alleges that Defendant Fowler was responsible for delaying his TB diagnosis, Plaintiff does not state a sufficient claim for § 1983 relief, see id. at 19-20; and (5) Defendant Fowler is entitled to immunity pursuant to Florida Statutes § 768.28(9) to the extent that Plaintiff asserts a state law claim for negligence.

In support of Fowler's Motion, she submitted the following exhibits: Def. Exs. A, Declaration of Nurse Raycendia Oden (formally Fowler) (Fowler's Declaration); A-1, excerpts of Belton's

7

medical records (filed under seal, <u>see</u> Order, Doc. 61); B, excerpt of Plaintiff's Deposition (Belton's Deposition), dated June 30, 2015; C, Declaration of Dr. Albert Carl Maier, M.D. (Maier's Declaration), dated September 29, 2015; D, excerpts of Belton's medical records (filed under seal, <u>see</u> Doc. 61).

## V. Plaintiff's Responses

In Plaintiff's Response (Doc. 60), he asserted that he needed more time for discovery. On January 13, 2016, the Court denied Plaintiff's request to reopen discovery, but granted him until February 17, 2016, to file a supplemental response to Defendant Fowler's Motion. <u>See</u> Order (Doc. 65) at 5; Order (Doc. 67) (granting him until March 9, 2016, to file a supplemental response). On March 10, 2016, Plaintiff requested an additional fifteen days or until March 23, 2016, to file a supplemental response. <u>See</u> Plaintiff's Motion for Extension of Time (Doc. 68). On March 25, 2016, Plaintiff filed a Sworn Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 69); Declaration of James Belton (Belton's Declaration; Doc. 70), dated March 2, 2016; Declaration of Percival Charles Ferris, Jr., Inmate No. 142336 (Ferris's Declaration; Doc. 71), dated March 11, 2016; and Declaration of Herman Wallace, Inmate No. 476821 (Wallace's Declaration; Doc. 72), dated March 20, 2016.

## VI. Law and Conclusions

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such

8

deprivation occurred under color of state law. <u>Salvato v. Miley</u>, 790 F.3d 1286, 1295 (11th Cir. 2015); <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); <u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Moreover, the Eleventh Circuit "'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." <u>Rodriguez v. Sec'y, Dep't of Corr.</u>, 508 F.3d 611, 625 (11th Cir. 2007) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)). More than conclusory and vague allegations are required to state a cause of action under 42 U.S.C. § 1983. <u>See</u> <u>L.S.T., Inc., v. Crow</u>, 49 F.3d 679, 684 (11th Cir. 1995) (per curiam); <u>Fullman</u>, 739 F.2d 553, 556-57 (11th Cir. 1984). "Moreover, 'conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal.'" <u>Rehberger v. Henry Cty., Ga.</u>, 577 F. App'x 937, 938 (11th Cir. 2014) (per curiam) (citation omitted). In the absence of a federal constitutional deprivation or violation of a federal right, Plaintiff cannot sustain a cause of action against Defendant Fowler.

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation.

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[6]  Thus, in its

---

[6] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

> prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. <u>Id.</u> However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. <u>Hudson</u>, 503 U.S. at 8-9, 112 S.Ct. at 1000.[7] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct. at 2327.[8]

<u>Thomas v. Bryant</u>, 614 F.3d 1288, 1306-07 (11th Cir. 2010).

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007). Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." <u>Richardson</u>, 598 F.3d at 737; <u>Valderrama v. Rousseau</u>, 780 F.3d 1108, 1116 (11th Cir. 2015) (setting forth the components of deliberate indifference as (1) the official "was aware of facts from which the inference could be drawn that a substantial risk of

---

[7] <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

[8] <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

serious harm exists," (2) the official "actually drew that inference," (3) the official "disregarded the risk of serious harm," and (4) the official's "conduct amounted to more than gross negligence.") (citation omitted).

The following material facts are undisputed. On April 15, 2009, the FDOC provided Plaintiff with a "Tuberculosis Symptom Questionnaire for Inmates" prior to his pre-confinement medical examination the following day, April 16th. See Maier's Declaration at 1, ¶ 3 (citing Def. Ex. D at 1-2). According to Dr. Maier, "Belton reported having no TB symptoms on the form." See id. However, according to Nurse K. Grega, Plaintiff reported only one symptom related to his stamina. Def. Ex. D at 1-2. On April 16, 2009, Plaintiff was provided a pre-special housing health assessment before he was placed in administrative confinement. See Maier's Declaration at 1, ¶ 3 (citing Def. Ex. D at 3).

On April 30, 2009, a nurse saw Plaintiff in the medical clinic for loss of weight and appetite. See id. at 2, ¶ 4 (citing Def. Ex. D at 6). On May 8, 2009, Plaintiff underwent an x-ray, which gave negative results. See id. (citing Def. Ex. D at 9). That same day, Plaintiff provided a sputum sample, which tested negative for Mycobacterium TB on May 11, 2009. See id. (citing Def. Ex. D at 8).

On May 26, 2009, Dr. Hoang saw Plaintiff in the medical clinic for complaints of weight loss and difficulty swallowing solid foods. See id. at ¶ 5 (citing Def. Ex. D at 12-13). Dr. Hoang treated Plaintiff for indigestion with abdominal pain and gave him Colace and Zantac. See id. According to Dr. Maier, difficulty

11

swallowing is not a symptom of TB, and weight loss alone would be an insufficient basis for a consideration of TB clinically, "although if accompanied by other complaints might rise to the level of suspicion." See id.

On May 29, 2009, Dr. Gonzalez saw Plaintiff in the medical clinic for complaints of a 101-degree temperature, dizziness, weight loss, and shortness of breath. See id. at ¶ 6 (citing Def. Ex. D at 15-16). Dr. Gonzalez treated Plaintiff for dizziness, weight loss, and mild shortness of breath and gave him Colace, Zantac, and antibiotics for an H. Pylori[9] gastrointestinal infection and instructed Plaintiff to return to the clinic if his symptoms persisted. See id.

On June 1, 2009, Plaintiff returned to the medical clinic for laboratory tests due to complaints of weight loss. See id. at ¶ 7 (citing Def. Ex. D at 16). Dr. Gonzalez diagnosed Plaintiff with anemia and placed him on a 4,000-calorie diet and prescribed Folic Acid to be taken twice a day for ninety days. See id. On June 3, 2009, the medical staff admitted Plaintiff to the infirmary for observation for two to three hours for complaints of a low grade fever and weakness; the attending nurse gave him Tylenol and Milk of Magnesium and instructed him about the necessity of fluids. See id. at ¶ 8 (citing Def. Ex. D at 17-19). Nurse K. Grega noted that Plaintiff had a negative TB test one month before on May 8, 2009. See id. (citing Def. Ex. D at 18-19). After observation, the staff

_____

[9] An H. pylori infection occurs when a type of bacteria called Helicobacter pylori infects the stomach. See http://www.mayoclinic.org/diseases.

12

released him. See id. The next day, on June 4, 2009, Dr. Hoang saw Plaintiff for his complaints of weakness and a low grade fever. See id. at ¶ 9 (citing Def. Ex. D at 20-22). Plaintiff was provided Tylenol and fluid administration, and Nurse K. Grega assisted with the abdominal pain assessment. See id.

On June 11, 2009, Dr. Hoang saw Plaintiff again for a fever, abdominal pain, weight loss, and some cramping. See id. at ¶ 10 (citing Def. Ex. D at 24-25). The medical staff admitted Plaintiff to the infirmary for observation for twenty-three hours and provided Tylenol, medication for a bacterial infection, and a liquid diet. See id. (citing Def. Ex. D at 25). The next day, on June 12, 2009, Dr. Hoang noted that Plaintiff was "doing fine and eating well." See id. at ¶ 11 (citing Def. Ex. D at 26-27). Dr. Hoang checked Plaintiff's gallbladder and documented that he was waiting for blood test results. See id. Plaintiff was released from the infirmary. See id. On June 13, 2009, Plaintiff returned to the medical clinic with complaints of dizziness and black-outs. See id. at ¶ 12 (citing Def. Ex. D at 27-28). The medical staff observed him for twenty minutes in the infirmary and provided hydration and Tylenol, and then released him. See id.

On June 16, 2009, the medical staff sent Plaintiff to RMC's radiology department for an X-ray procedure. See id. at 3, ¶ 13 (citing Def. Ex. D at 29-30). Upon Plaintiff's return to CCI later that day, Dr. Hoang placed him on a twenty-three-hour observation in the infirmary and provided Motrin and antibiotics. See id. On June 17, 2009, Dr. Hoang diagnosed Plaintiff with possible active

13

interstitial pulmonary disease and considerable pericardial effusion. See id. at ¶ 14 (citing Def. Ex. D at 30-31). According to Dr. Maier, Dr. Hoang transferred Plaintiff to RMC due to Plaintiff's pulmonary issues. See id.

On June 18, 2009, Plaintiff was admitted to RMC. See id. at ¶ 15 (citing Def. Ex. D at 34). According to Dr. Maier, the "medical record reports no surgery at any time was performed on [Plaintiff]." See id. While at Memorial Hospital in Jacksonville, Florida, Plaintiff underwent a bronchoscopic inspection[10] on July 8, 2009, followed by a mediastinoscopy[11] on July 13, 2009, to secure fluid and tissue isolates to allow a thorough examination of the state of his disease. See id. (citing Def. Ex. D at 36-37). Dr. Maier explains that "[b]oth would have required brief general anesthesia and the mediastinal procedure, in addition would require a small access incision in the anterior neck which [Plaintiff] may be interpreting as 'surgery.'" See id. at ¶ 15.

First, Plaintiff asserts that Defendant Fowler should have: (1) isolated the infected inmate in C dormitory so that Plaintiff

---

[10] Bronchoscopy is a procedure in which a physician uses a thin tube (bronchoscope) to look at the patient's lungs and air passages. The tube passes through the patient's nose or mouth, down the throat and into the lungs. See http://www.mayoclinic.org.

[11] This procedure is performed in the hospital with general anesthesia. An endotracheal tube is placed in the nose or mouth to help the patient breathe. A small surgical cut is made in the neck. A device called a mediastinoscope is inserted through this cut and gently passed into the mid-part of the chest. Tissue samples are taken of the lymph nodes around the airways. The scope is then removed, and the surgical cut is closed with stitches. See U.S. National Library of Medicine, https://www.nlm.nih.gov.

and other inmates would not have been exposed to the TB virus, and
(2) timely recognized Plaintiff's "obvious symptoms" and referred
him to a specialist at RMC for proper medical care and treatment.
See AC at 6-7, ¶¶ 16, 19. Undoubtedly, failure to protect an inmate
from exposure to TB may be grounds for a 42 U.S.C. § 1983 action
based on deliberate indifference. See Farmer v. Brennan, 511 U.S.
825 (1994) (holding that prison officials can only be held liable
where an inmate can show that officials knew of and consciously
disregarded an excessive risk to the prisoner's health). The
Eleventh Circuit has stated:

> "A prison official violates the Eighth
> Amendment when a substantial risk of serious
> harm, of which the official is subjectively
> aware, exists and the official does not
> respond reasonably to the risk." Caldwell, [12]
> 748 F.3d at 1099 (emphasis omitted) (quoting
> Carter v. Galloway, 352 F.3d 1346, 1349 (11th
> Cir. 2003)) (internal quotation marks
> omitted). To prevail on such a claim brought
> under § 1983, the plaintiff must show: (1) a
> substantial risk of serious harm; (2) the
> defendants' deliberate indifference to that
> risk; and (3) a causal connection between the
> defendants' conduct and the Eighth Amendment
> violation. See id. The first element, a
> substantial risk of serious harm, is evaluated
> using an objective standard. Id. There must be
> a "strong likelihood" of injury, "rather than
> a mere possibility," before an official's
> failure to act can constitute deliberate
> indifference. Brown v. Hughes, 894 F.2d 1533,
> 1537 (11th Cir. 1990) (per curiam) (quoting
> Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th
> Cir. 1989)).

Brooks v. Warden, 800 F.3d 1295, 1301 (11th Cir. 2015); Ivory v.
Warden, Governor of Ala., 600 F. App'x 670, 677-78 (11th Cir. 2015)

---

[12] Caldwell v. Warden, FCI Talladega, 748 F.3d 1090 (11th Cir.
2014).

(per curiam) (stating that, even if plaintiff had established an excessive risk to inmate health or safety, liability cannot be imposed solely because of the presence of objectively inhumane prison conditions; plaintiff has not alleged any specific facts or produced any evidence indicating that the named defendants subjectively knew of and disregarded a substantial risk so as to make out an Eighth Amendment claim) (quotations and citations omitted).[13]

In the instant action, Plaintiff fails to establish that Defendant Fowler knew of an infected inmate who had active TB and who needed to be isolated from other inmates and that she failed to isolate that allegedly infected inmate from Plaintiff. At Plaintiff's deposition, he acknowledged that he did not know whether or not Defendant Fowler was specially tasked with the testing and handling of TB patients. See Plaintiff's Deposition at 24, lines 21-25; 25, line 1.

Defendant Fowler, in her Declaration, avers that she was not the infectious disease nurse in April and May of 2009 when the alleged instance of deliberate indifference occurred. See Fowler's Declaration at 1, ¶ 5. She explains that it is the infectious disease nurse's role to monitor inmates who may pose a medical threat to inmates and staff. See id. As such, the infectious disease nurse is also responsible for "administrative aspects of assessing any alleged tuberculosis outbreak, completing requisite

---

[13] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam) (citation omitted).

16

DOC documents, and reporting cases to the Department of Health." See id. at 1-2, ¶ 5. Consistent with Defendant Fowler's assertion, Dr. Maier states that FDOC records show that Fowler obtained her certificate in infectious control in November 2011. See Dr. Maier's Declaration at 4, ¶ 20. Therefore, Fowler could not have been the infectious disease nurse at the time of the alleged events because such "specialized training is mandatory before a nurse may serve as the infectious disease nurse" at any FDOC institution. See id.

Insofar as Plaintiff asserts that Fowler should have identified a TB infected prisoner during her regular nursing duties, he fails to demonstrate that Fowler knew of any inmate with active TB that needed to be isolated to prevent any alleged exposure to active TB. Defendant Fowler states that, if she had suspected that a prisoner had active TB, she would have notified the doctor so that those medical professionals responsible for identifying inmates with active TB could take appropriate action. See Fowler's Declaration at 2, ¶ 5.

Morever, Plaintiff fails to demonstrate any causal connection between any action on the part of Defendant Fowler and Plaintiff being exposed to an inmate with active TB. As previously stated, the Eleventh Circuit "'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." Rodriguez, 508 F.3d at 625. At Plaintiff's deposition, when asked why he believed Fowler should have protected him from contracting TB, Plaintiff was unable to state facts demonstrating that Fowler knew of any inmate

17

who posed a serious risk of harm to Plaintiff's health and that she
disregarded that risk thereby leading to his contracting TB. At his
deposition, Plaintiff asserted that Defendant Fowler was liable
under § 1983 because, when he declared a medical emergency in May
2009 and told her that he suspected he had TB, she examined him,
determined that the visit was not an emergency, and then directed
him to follow the routine sick call procedure. The following
deposition excerpts reflect the basis upon which Plaintiff holds
Fowler responsible for violation of his federal constitutional
rights.

> Q    Why do you think that Nurse Fouler[14] was
> -- should have protected you from any inmate
> that had TB? Why did you choose Nurse Fowler
> as a defendant?
>
> A    When, **I first tried to go to medical,**
> **medical emergency, she said that it wasn't a**
> **medical emergency.**
>
> Q    And when was that?
>
> A    So that had to be May. That's before ...
>
> Q    Were you still in confinement?
>
> A    No, I had got out of confinement.
>
> Q    And what did you tell her?
>
> A    I told her that I wasn't feeling good. I
> said -- and I believe that I probably had TB
> or something. Because I always thought that
> from the time when the inmate was telling me -
> - came to my door in confinement -- that they
> was being put on medication for the TB, I felt
> that if I was sick, that's what it was,

---

[14] To the extent that Defendant's name is misspelled in the
transcript, the Court will correct the spelling and refer to her as
"Fowler."

because it couldn't have been from no other --
couldn't have been nothing from no [sic]
nothing  else because I always kept myself up.

Q    And that's how you think that Nurse
Fowler should have --

A    Well, I told her, so she was aware.  Then
I feel like for her to be a nurse, she should
have known to check with me and to see.

Q    But you just told her verbally, right?

A    Okay. I told her, and like I said, **she
told me it wasn't a medical emergency**. So I
had to go back through the procedure. I guess
she wanted me to, I guess, write a sick [c]all
request or slip.

          . . . .

Q    Okay. So your -- the reason why you named
her is because you saw her and told her that
you were feeling no good?

A    Yes, ma'am.

Q    And that -- and you think that she should
have immediately acted on that and not just
told you that it wasn't a medical emergency?

A    Well, I thought that -- I fell [sic]
like I had a serious medical need at the time.
I mean, to say that if you get put in a
situation and you feel like it's an emergency,
then you should go right away to get it
attended to. So I did what I [was] supposed to
did [sic], but she told me that it wasn't a
medical emergency.

          . . . .

Q    Were you in medical -- in the actual
medical building?

A    Yes, ma'am.

Q    **Being examined by her?**

A    **Yes, ma'am. She told me that it wasn't a
medical emergency** when I was telling her how I

was feeling, the loss of appetite and stuff. **So she told me to go through sick [c]all,** to write a sick [c]all slip.

Q    So did you follow her advice?

A    Yes, ma'am.

Q    And when you saw her, it was in the medical building? You had an appointment, a sick [c]all?

A    Yes, ma'am. I tried to come through medical emergency. That's the first thing I tried to do.

Q    This would have been in May, late May of 2009?

A    Yes, ma'am.

Plaintiff's Deposition at 23-26 (emphasis added).

Plaintiff names Nurse Fowler as a Defendant because she allegedly determined that his declaration of a medical emergency in late May of 2009 did not qualify as an emergency, and therefore advised him to seek medical attention through the FDOC's sick call procedures. See Belton's Declaration ("Without evaluating me[,] Nurse Fowler told me that I had no medical emergency, and that to sig[n] up for sick call."); Wallace's Declaration ("I was in the classification/medical lobby when James Belton came to medical on a medical emergency" and "I witnessed Nurse Fowler" tell Belton to sign up for sick call.). To the extent that Fowler may have told Plaintiff that his needs were not of an emergency nature, she exercised her own medical judgment in referring him to follow-up through the FDOC's routine sick call procedure. According to Plaintiff, he followed Nurse Fowler's advice and requested medical

attention through routine channels. <u>See</u> AC at 5, ¶ 7. At most, the summary judgment evidence indicates that Defendant Fowler and Plaintiff disagreed regarding the best wayWha to treat Plaintiff's medical needs and the urgency of those needs. Indeed, a difference in medical opinion between medical personnel and the inmate as to the diagnosis or course of treatment is insufficient to support an Eighth Amendment claim. <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991); see <u>Coker v. Corizon Medical Services, Inc.</u>, No. 15-11414, 2016 WL 909365, at *1 (11th Cir. Mar. 10, 2016) (per curiam) (citation omitted).

To the extent that Plaintiff complains about Fowler's negligent acts or unprofessional conduct, the law is well settled that the United States Constitution is not implicated by the negligent acts of prison officials or FDOC employees. <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) ("As we held in <u>Daniels</u>, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). While Plaintiff's allegations may suggest medical malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393 (11th Cir. 1994) (citing <u>Estelle</u>, 429 U.S. at 106). Consequently, any allegedly negligent conduct of which Belton complains does not rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

21

Moreover, the medical records refute Plaintiff's assertion that he saw Defendant Fowler in the medical department in late May of 2009. As explained by Defendant Fowler, if she had examined Plaintiff in the medical department, she would have documented the visit in his medical record. See Fowler's Declaration at 2, ¶ 6. The medical records are devoid of any entry showing the alleged visit. See id. at ¶¶ 6, 7 (citing Def. Ex. A-1 at 1-19); see also Belton's Declaration (stating that Fowler never evaluated him, but just told him to sign up for sick call); Wallace's Declaration (witnessing Belton in the classification/medical lobby). The medical records show that Plaintiff did not have contact with Defendant Fowler concerning his medical care until September 2009, after he was already diagnosed and receiving TB treatment. See Fowler's Declaration at 2, ¶ 7 (citing Def. Ex. A-1 at 20-21). At most, Defendant Fowler merely told Plaintiff that he needed to use the routine sick call procedure, which he did. Therefore, Plaintiff has neither shown that Fowler failed to protect him nor that she was deliberately indifferent to his serious medical needs.

Plaintiff also fails to demonstrate sufficient facts that he was subjected to an inmate with an active case of TB and that even if he had been, that the risk was ignored or that the response was reckless. Plaintiff acknowledged that he did not have any personal knowledge of any inmate with active TB; instead, it appears that his allegations are based on mere rumor or conjecture. Belton's Deposition at 10-14. Dr. Maier explains that his research indicates that there was no dormitory-wide distribution of TB treatment at

CCI between April 2009 and June 2009. See Maier's Declaration at 4, ¶ 19; see also Ferris's Declaration (explaining that he and other inmates were "tested by what is called a skin pop test"). Dr. Maier further avers that Plaintiff was the only instance of a confirmed case of M. Abscessus TB that was reported to the Department of Health in 2009. See id.

Even assuming that Plaintiff was exposed to an inmate who had active typical TB, he has not shown an affirmative causal connection between Defendant Fowler's actions or omissions and the alleged federal constitutional deprivation. Upon a review of Plaintiff's medical records documenting the medical care and treatment provided for the relevant time period at CCI and RMC, Dr. Maier avers, in pertinent part:

> The sputum sample taken on June 22, 2009, was cultured yielding the only positive result for such testing in his medical file. Id. at 38-39; 41 [(Def. Ex. D, sealed medical records)]. On July 9, 2009, Belton's infecting organism was pinpointed as *Mycobacterium abscessus* ("*M. Abscessus*"). (Id.) The *M. abscessus* is an atypical tuberculosis different from *mycobacterium tuberculosis var. hominis.*[15] *Mycobacterium tuberculosis var. hominis* is the principal causal agent for most

---

[15] According to the Centers for Disease Control and Prevention, Mycobacterium abscessus is "a bacterium distantly related to the ones that cause tuberculosis and leprosy. It is part of a group of environmental mycobacteria and is found in water, soil, and dust." See http://www.cdc.gov/HAI/organisms/mycobacterium.html. Typical TB is a contagious form of TB spread by aerosolized particles containing the bacteria with human to human transmission; atypical TB is not spread from human to human, but is present in the environment and affects and infects specific groups of people, such as those with chronic lung diseases - emphysema, chronic obstructive pulmonary disease (COPD), Sarcoidosis. See Louisiana State University School of Medicine, New Orleans, https://www.mdschool.lsuhsc.edu.

human tuberculosis and is spread from person-to-person contact. *Mycobacterium tuberculosis var. hominis* is highly contagious and spread through the air person to person when the person with TB coughs, speaks, or sneezes emitting the bacteria. On the other hand, *M. Abscessus* is environmental and readily found in dust, soil, pollen, air and water. As with the better known and distantly related *Mycrobacterium tuberculosis*, it is treated with the typical four TB medications regimen: INH [(Isoniazid)], Rifampin, Ethambutol, and Pyrazinamide.[16]

The majority of *M. Abscessus* infections come from the environment and are not spread from person-to-person contact. Of note in Belton's deposition, Belton stated he spent considerable time on the recreational field and hence he risked exposure to the bacterium.[17] Because the infection is environmental, individuals carrying the infection do not need to be isolated from others. Most people are exposed to the bacterium every day and never develop symptoms because their immune systems fight off the bacteria. That this bacterium is prevalent in the environment generally, protecting [an] inmate from contracting *M. Abscessus* would be most difficult because it depends on the individual and his susceptibility. Based on the type of agent and its mode of transportation, it is my professional opinion that Belton most likely contracted the bacterium through environmental factors rather than person-to-person contact.

Maier's Declaration at 3, ¶¶ 17-18 (emphasis added and enumeration omitted).

To the extent that Fowler's action may have delayed Plaintiff's diagnosis and treatment, the delay was not violative of his federal constitutional rights. Dr. Maier opined:

---

[16] See http://www.mayoclinic.org/diseases.

[17] See Belton's Deposition at 8-9.

> The medical records evidence that
> Belton's health concerns were taken seriously
> by medical staff and the medical staff
> provided Belton treatment while attempting to
> render a diagnosis. In my opinion, that it
> took two months and a hospital visit to
> diagnose Belton's condition was clinically
> acceptable and did not result in an improper
> delay of treatment.

Maier's Declaration at 3, ¶ 16 (emphasis added and enumeration
omitted). Moreover, the medical records and Defendant Fowler's
averments in her Declaration show that she did not participate in
his care until September 2009, well after Plaintiff was diagnosed
and started treatment.

Plaintiff states that Dr. Gonzalez and Dr. Hoang, based on
their unprofessional comments, "believed" that Plaintiff was
"faking the illness." AC at 6, ¶ 11. As to any alleged verbal abuse
or unprofessional remarks by Defendant Fowler, see Belton's
Declaration (referring to Fowler's "very bad mood"), such
allegations do not state a claim of federal constitutional
dimension. See Hernandez v. Fla. Dep't of Corr., 281 F. App'x 862,
866 (11th Cir. 2008) (per curiam) (citation omitted).

> "[M]ere threatening language and gestures of a
> custodial office[r] do not, even if true,
> amount to constitutional violations." Coyle v.
> Hughes, 436 F.Supp. 591, 593 (W.D. Okl[a].
> 1977). "Were a prisoner . . . entitled to a
> jury trial each time that he was threatened
> with violence by a prison guard, even though
> no injury resulted, the federal courts would
> be more burdened than ever with trials of
> prisoner suits . . . ." Bolden v. Mandel, 385
> F.Supp. 761, 764 (D. Md. 1974). See Johnson v.
> Glick, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973)
> (the use of words, no matter how violent, does
> not comprise a section 1983 violation).

McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983); Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) ("[I]t is not a violation of the Eighth Amendment for a prison physician to consult with a prisoner concerning a medical condition in an aloof or unfriendly way. Much more is required.") (citation and footnote omitted).

Finally, under 28 U.S.C. § 1367(a), a district court may exercise supplemental jurisdiction over state law claims related to the federal court action. Since Plaintiff's Eighth Amendment claim has not survived the summary judgment stage, this Court will not exercise supplemental jurisdiction over Plaintiff's state law claim, see AC at 3-4.[18] See 28 U.S.C. § 1367(c)(3) (stating that the district courts may decline to exercise supplemental jurisdiction over a claim under § 1367(a) when the court has dismissed all claims over which it has original jurisdiction).

In sum, Plaintiff fails to establish a genuine issue of material fact pertinent to the care he received from Defendant Fowler relating to his above-described medical complaints. The evidence does not provide a basis upon which a jury could find that Defendant Fowler deviated from the standard of care applicable to a deliberate indifference claim. Therefore, Defendant Fowler is

---

[18] Florida Statutes section 768.28(9)(a) protects an employee/officer of the state from personal liability for acts within the scope of the officer's employment, unless the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a); see Motion at 20-21 (stating that, as to Plaintiff's state law claim of negligence, Defendant Fowler has immunity under Florida Statutes section 768.28(9)(a) to the extent she was acting within the scope of her employment).

entitled to summary judgment on her behalf, and her Motion for Summary Judgment is due to be granted.

Therefore, it is now

**ORDERED:**

1.    Plaintiff's Motion for Extension of Time (Doc. 68) is **GRANTED**, and his Sworn Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 69), Declaration of James Belton (Doc. 70), Declaration of Percival Charles Ferris (Doc. 71), and Declaration of Herman Wallace (Doc. 72) are accepted as timely filed.

2.    Defendant Fowler's Motion for Summary Judgment (Doc. 57), filed September 30, 2015, is **GRANTED**.

3.    The Clerk shall correct the docket to reflect Belton's correct inmate number: J00248.

4.    The Clerk shall enter judgment in favor of Defendant Fowler.

5.    The Clerk shall close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of March, 2016.

UNITED STATES DISTRICT JUDGE

sc 3/25
c:
James Belton, FDOC #J00248
Counsel of Record